UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHAD J. PETITPAS,
    *Plaintiff*,

v.

GRIFFIN *et al.*,
    *Defendants*.

No. 3:20-cv-00769 (JAM)

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Chad J. Petitpas is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* under 42 U.S.C. § 1983 against four DOC employees, principally alleging that they violated his constitutional rights by retaliating against him, putting his safety at risk, and failing to take adequate steps to combat COVID-19. He seeks damages and injunctive relief in connection with his claims. For the reasons set forth below, I will allow some of Petitpas's claims to proceed after my initial review.

**BACKGROUND**

Petitpas names four defendants: Captain Griffin, Officer Tiede, Warden Stephen Faucher, and then-Deputy Commissioner Angel Quiros. Doc. #19 at 13-14. Each defendant is sued in their official and "unofficial" capacities, which I construe to mean their individual capacities. *Ibid*.

The following facts are alleged in Petitpas's amended complaint and the documents attached to it, and they are accepted as true for purposes of initial review only.[1] On April 21, 2020, the DOC Commissioner issued a mask requirement for on-duty DOC staff members whenever social distancing is not possible, effective on April 22. *Id.* at 2 (¶ 1); 16 (Ex. A). That

---

[1] Petitpas filed this lawsuit on June 2, 2020, but moved to amend his complaint before an initial review order was issued. Docs. #1, #17. After I granted his motion to amend, Doc. #18, Petitpas filed his amended complaint, which is the operative complaint for this initial review order. Doc. #19.

same day, Warden Faucher of Brooklyn Correctional Institution ("Brooklyn") posted a Notice to Inmate Population, signed by Deputy Commissioner Quiros, requiring masks to be worn when inmates are exiting their cells or cubicles, or are in common areas, effective April 22, with inmates subject to progressive discipline for noncompliance. *Id.* at 2 (¶ 2); 17 (Ex. B).

On May 1, the first inmate from Petitpas's housing unit was removed after exhibiting COVID-19 symptoms; he later tested positive and was transferred to solitary confinement at Northern Correctional Institution ("Northern"). *Ibid.* (¶ 3). By May 8, eight more inmates were transferred to Northern. *Ibid.* (¶ 4). Between May 1 and May 8, Petitpas spoke to Warden Faucher "on two separate occasions asking him to enforce the mask policy because staff were refusing to wear their masks and staff were ignoring the inmates who were refusing to wear their masks." *Ibid.* (¶ 5). Several other inmates also spoke to Warden Faucher about this issue. *Ibid.*

By May 10, the number of people who were sick in Petitpas's housing unit reached "frightening" levels, including Petitpas's bunk mate and others who stayed in bed and refused all meals for five days, yet these inmates refused to wear their masks. *Id.* at 3 (¶ 6).

On May 11, Petitpas asked Officer Williams to alert medical staff that other inmates in the housing unit were sick and needed temperature checks, and Officer Williams indicated he would let the "Brass" know right away, but no medical staff came to the unit. *Id.* at 3 (¶ 7). Petitpas also wrote two Inmate Request Forms to Warden Faucher. *Ibid.* (¶ 8). The first was a Freedom of Information request seeking confirmation of the DOC's mask policy and the number of disciplinary reports that had been issued under the mask policy. *Ibid.* The second sought to preserve two surveillance videos, which would show several inmates asking Warden Faucher on April 26 to enforce the mask policy while Officer Bauer was standing two feet away from them not wearing a mask, and Bauer and another officer on May 8 not wearing masks during their

2

shifts. *Id.* at 3-4 (¶¶ 10, 12). Warden Faucher claims he did not receive these requests. *Ibid*. (¶¶ 9, 11). Petitpas and two other inmates again requested medical staff perform temperature checks on May 12, but no medical staff came to the unit. *Id.* at 4 (¶ 13).

On May 13, Petitpas contacted a friend by telephone and requested that the friend contact the facility and Deputy Commissioner Quiros about the lack of response to the requests for temperature checks and the failure of correctional and medical staff to provide medical attention for inmates who exhibited COVID-19 symptoms. *Id.* at 4 (¶ 14). About 30 minutes later, medical staff came to the housing unit to take the inmates' temperatures. *Ibid.* (¶ 15). That day at 2:00 pm, while Petitpas was at recreation, Captain Griffin came to his unit and told the inmates that "Petitpas, is on the phone dropping kites (notes) YOU ARE SICK!" *Id.* at 5 (¶ 16). Several inmates confronted Petitpas believing he was an informant because of Griffin's statements.[2] *Id.* at 5 (¶ 17). This action allegedly placed Petitpas at risk of serious injury because of how it changed his reputation among the inmates. *Id*. at 8-9 (¶¶ 34-36). Petitpas never told Griffin about any inmate in his unit, so she must have obtained the information from his phone call to a friend, even though she is not the phone monitor and DOC staff are prohibited from sharing confidential information under Administrative Directive 1.13. *Id.* at 5-6 (¶ 21).

On May 15, Petitpas filed a written complaint to Warden Faucher requesting that Griffin be reprimanded for her statements in violation of DOC Administrative Directives 1.13 and 2.17, and requesting that Griffin provide a written apology and a clarification that she had made up the accusation that he was an informant. *Id.* at 5 (¶ 19). In response to this complaint, Warden Faucher acknowledged that Petitpas's "name was mentioned during the course of a conversation

---

[2] Petitpas represents that he has attached declarations from inmates describing Captain Griffin's statements and the atmosphere in the housing unit after her communication to the inmates, but there are not any declarations attached to the amended complaint about Griffin's conduct. *Id.* at 5 (¶ 18).

as to why [Griffin] was questioning [the inmates'] state of health," but that he saw no violation of the Administrative Directives "as there was not malicious intent or confidential information divulged." *Id.* at 5 (¶ 20); 22 (Ex. C).

On May 18, staff discovered a four-inch piece of metal that had been broken off two different lockers in the housing unit, posing a potential safety risk to inmates and staff, but Warden Faucher and Captain Griffin took no action, and the pieces of metal remain outstanding. *Id.* at 6 (¶ 22).

On May 23, Petitpas was reading on his bed when he heard Officer Tiede screaming at an individual who was not wearing his mask correctly, and telling the individual that if he had "a problem with it" to "go take it out on Petitpas!" and "Petitpas is who you should be mad at." *Id.* at 6 (¶ 23). In response to Tiede's screaming Petitpas's name repeatedly, some inmates asked what Petitpas had "to do with anything" and why Officer Tiede kept bringing him up, while others called for Petitpas to confront Officer Tiede. *Ibid.* (¶ 24). Petitpas attempted to approach Tiede and ask him to stop using Petitpas's name to incite the inmates, but Tiede was "belligerent" and continued to scream Petitpas's name for several minutes even after Petitpas walked away from him. *Ibid.* (¶ 25). Tiede's comments were made in retaliation for Petitpas's complaints to Faucher, insinuated Petitpas was responsible for the DOC's mask requirement, attempted to escalate tensions in the unit, and disclosed details "that were only discussed in the Inmate Request" Petitpas sent to Warden Faucher. *Id.* at 7 (¶¶ 27-28).

Several officers encouraged Petitpas to write up this incident and indicated Tiede's actions made them uncomfortable working with Tiede, especially given the missing pieces of metal in the unit. *Ibid.* (¶ 26). Petitpas filed a written complaint with Faucher that day, which requested that Tiede be reprimanded for violating Administrative Directives 1.13 and 2.17, and

placed on a status in which he could not have contact with inmates. *Id*. at 7 (¶ 29); 23-26 (Ex. D). Faucher's response on June 11 stated Petitpas's allegations of staff misconduct "will be looked into." *Id*. at 7 (¶ 30); 27 (Ex. E).

Petitpas tested positive for COVID-19 on June 12 and was moved to the quarantine unit across the hall. *Id*. at 7-8 (¶ 31). On June 17, Tiede came to the quarantine unit—even though he was not working in it—and called Petitpas "everyone's problem," blamed inmates having to move out of their units on him, and told those frustrated by the cleaning and mask requirements to "get together and take it out on Petitpas." *Id.* at 8 (¶ 31). Petitpas filed a written complaint about this incident, which Warden Faucher responded to by stating "[a] review of the allegations of misconduct has been conducted, and the issue has been handled as deemed appropriate." *Id*. at 8 (¶ 33); 28-29 (Ex. F). Petitpas also attaches two Inmate Request Forms submitted to Warden Faucher by other inmates that corroborate Petitpas's allegations about Officer Tiede's conduct. *Id*. at 30-31 (Ex. F).

Ultimately, 51 of the 80 inmates in Petitpas's initial housing unit tested positive for COVID-19. *Id*. at 9 (¶ 36). Brooklyn had more COVID-19 cases than any other DOC facility, with 220 of 330 inmates contracting COVID-19, as well as more than half of the 68 correction officers. *Id*. at 10-11 (¶ 44).

On July 24, Petitpas filed this amended complaint, which alleges claims against each defendant for retaliation in violation of his First Amendment rights and deliberate indifference to his health and safety in violation of the Eighth Amendment. *Id*. at 9-12 (¶¶ 36, 40, 45, 50). Petitpas seeks money damages and injunctive relief to keep Griffin and Tiede away from him unless it is essential under the normal course of operations, to prevent Griffin and Tiede from making accusations against Petitpas by name, and to require all defendants to refrain from

discussing details of his complaint until "reasonable measures have been made" to abate the safety risk due to the missing pieces of metal. *Id*. at 13-14. Petitpas has since been transferred to Corrigan Correctional Institution ("Corrigan"). Doc. #24. Officer Tiede has also been transferred to a different DOC facility. Doc. #23 at 2 (¶ 6).

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

### *First Amendment retaliation*

Petitpas alleges that each defendant violated his First Amendment rights by retaliating against him for his complaints about Brooklyn's response to COVID-19 and their subsequent actions. Doc. #19 at 9-12 (¶¶ 36, 40, 45, 50).

"Prison officials may not retaliate against inmates for exercising their constitutional rights." *Perez v. Cook*, 2020 WL 3893024, at *5 (D. Conn. 2020) (citation omitted). "To establish a First Amendment retaliation claim, [Petitpas] must show (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (cleaned up). The adverse action must have been serious enough to "deter a similarly situated individual of ordinary firmness from exercising [his] constitutional rights." *Fabricio v. Annucci*, 790 F. App'x 308, 311 (2d Cir. 2019) (same).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation— can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015). For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.* (cleaned up).

Petitpas alleges that Captain Griffin retaliated against him in violation of the First Amendment by telling the inmates in Petitpas's housing unit that he was an informant after his phone call to a friend about Brooklyn's COVID-19 response. Doc. #19 at 8-9 (¶¶ 34-36). Even assuming that Petitpas's alleged speech—his call with a friend and the friend's relaying Petitpas's complaint to the DOC and Quiros—was protected, the Second Circuit has held that the types of statements made by Griffin do not constitute "adverse action" giving rise to a First Amendment retaliation claim without a factual showing that that the comments actually risked

7

inciting other inmates against him. *See Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) (affirming dismissal of a prisoner's retaliation claim because the risk of assault from a guard telling other inmates he was an "informant" and a "rat" was not "sufficient to deter a reasonable prisoner in the exercise of his constitutional rights."), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002); *see also Morales v. Mackalm*, 278 F.3d 126, 129, 131 (2d Cir. 2002) (*per curiam*) (allegations that a guard "yelled out loud that plaintiff was a 'stoolie' while other inmates, working nearby could hear her, thus stigmatizing plaintiff as a rat in an attempt to have him hurt by other inmates" are not sufficient to plead an adverse action (cleaned up)), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002). Petitpas has not alleged a plausible First Amendment retaliation claim against Captain Griffin because he has not alleged specific facts, as opposed to conclusory assertions, demonstrating that Griffin's accusations actually risked inciting violence by the other inmates against Petitpas.

Petitpas also alleges that Officer Tiede and Warden Faucher retaliated against him for filing complaints with Faucher by having Tiede encourage other inmates to take out their frustrations on Petitpas. Doc. #19 at 9-11 (¶¶ 37, 40, 42-43, 45). Although "[t]he filing of prison grievances is a protected activity," *Brandon*, 938 F.3d at 40, claims of "retaliatory verbal abuse" do not constitute adverse action if they "do not include any allegations of physical harm" nor are "alleged with any specificity to suggest that they would deter a prisoner of ordinary firmness from exercising his constitutional rights." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012). Petitpas's amended complaint does not allege any non-conclusory facts that he actually faced physical injury due to Tiede's screaming his name and encouraging inmates to take out their frustrations on him. Indeed, Petitpas's complaint states that other inmates "agreed" to file inmate requests to Warden Faucher about Tiede's behavior and questioned why Tiede was screaming

8

Petitpas's name. Because Petitpas does not allege facts demonstrating that Tiede's actions caused him to face physical harm or would deter a prisoner of ordinary firmness from filing complaints, he has not alleged a plausible First Amendment retaliation claim against Tiede and Faucher.

Finally, although Petitpas alleges a First Amendment claim against Deputy Commissioner Quiros, his complaint does not specify how Quiros retaliated against him for protected conduct or otherwise violated his First Amendment rights. *See* Doc. #19 at 12 (¶ 50). Accordingly, I will also dismiss Petitpas's First Amendment claim against Quiros.

### *Eighth Amendment deliberate indifference*

Petitpas alleges that each defendant was deliberately indifferent to his health and safety in violation of the Eighth Amendment. Doc. #19 at 9-12 (¶¶ 36, 40, 45, 50). The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. The Supreme Court has long recognized that prison officials violate the Eighth Amendment if they are deliberately indifferent to a substantial risk of serious harm to a sentenced prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "The Eighth Amendment requires prison officials to 'take reasonable measures to guarantee the safety of the inmates,'" and "[t]hat extends to 'protect[ing] prisoners from violence at the hands of other prisoners.'" *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Farmer*, 511 U.S. at 832, 833).

In order to establish an Eighth Amendment claim of deliberate indifference to safety, a prisoner must show that: (1) he was subject to conditions of confinement that posed an objectively serious risk of harm, as distinct from what a reasonable person would understand to be a minor risk of harm; and (2) a defendant prison official acted not merely carelessly or negligently but with a subjectively reckless state of mind akin to criminal recklessness (*i.e.*,

9

reflecting actual awareness of a substantial risk that serious harm to the prisoner would result). *See Morgan*, 956 F.3d at 89; *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

Because Petitpas's Eighth Amendment claims differ with respect to each defendant, I will address them each in turn.

### *Captain Griffin*

Petitpas alleges that Captain Griffin subjected him to an unreasonable risk to his health and safety by telling other inmates Petitpas was an informant. Doc. #19 at 8 (¶¶ 34-36). The Second Circuit has recognized that "a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners." *Burns v. Martuscello*, 890 F.3d 77, 91 (2d Cir. 2018).[3] Petitpas alleges that Griffin told many of the inmates in his unit that he was snitching on them, placing him in danger, and that several inmates confronted him, believing he was an informant. For the objective prong, Petitpas has plausibly alleged that he

---

[3] Prior to the Second Circuit's decision in *Burns*, I ruled that "a plaintiff bringing such a claim must also allege that he suffered some harm as a result of being labeled a snitch or informant." *Farrow v. Martinez*, 2016 WL 3546205, at *2 (D. Conn. 2016) (citations omitted); *see also Campbell v. Gardiner*, 2014 WL 906160, at *4 (W.D.N.Y. 2014) (collecting cases). But in recognizing that "a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch," the Second Circuit did not mention physical harm, nor did it refer to the many district court holdings that have required physical harm. *Burns*, 890 F.3d at 91. Instead, the Second Circuit cited Eighth Circuit and Tenth Circuit cases, along with an older district court decision, each of which held that labeling an inmate a snitch is sufficient to state an Eighth Amendment claim without a physical harm requirement. *Ibid.*; *Irving v. Dormire*, 519 F.3d 441, 450-51 (8th Cir. 2008) (rejecting argument that physical harm is necessary for an Eighth Amendment claim based on falsely labeling an inmate a snitch to proceed); *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) ("labeling an inmate a snitch satisfies the *Farmer* standard, and constitutes deliberate indifference to the safety of that inmate") (citation omitted); *Watson v. McGinnis*, 964 F. Supp. 127, 132 (S.D.N.Y. 1997) (collecting cases and concluding "a guard's intentionally calling a prisoner a snitch in order to cause him harm by other inmates states an Eighth Amendment excessive force claim."). In light of the Second Circuit's statements and choice of citations in *Burns*, I am satisfied that Petitpas has alleged a plausible Eighth Amendment deliberate indifference claim for the purpose of this initial review even though he does not allege that he suffered any physical harm due to Captain Griffin's actions. *See Olivencia v. Pappusha*, 2019 WL 288116, at *5 (D. Conn. 2019) (allowing "this Eighth Amendment claim[] to proceed to enable the plaintiff to further develop the record" even though "[t]he plaintiff alleges only that defendant Brewer called him a snitch before other inmates" and "does not allege that he suffered any injury attributable to the statement.").

faced an objectively serious risk of harm as a result of Griffin's actions. As to the subjective prong, Petitpas has plausibly alleged that Griffin acted recklessly by deliberately telling other inmates Petitpas was informing on them, even though it is "well understood that inmates known to be snitches are widely reviled within the correctional system." *Ibid*. Accordingly, I conclude that Petitpas has sufficiently alleged that Griffin acted with deliberate indifference to a substantial risk of serious harm to his safety for initial pleading purposes.

### *Officer Tiede*

Petitpas brings an Eighth Amendment deliberate indifference claim against Officer Tiede for screaming Petitpas's name and encouraging other inmates to take out their frustrations on him on two occasions, even after prison officials knew that two pieces of metal had gone missing. Doc. #19 at 9-10 (¶¶ 37-40). "While an actual physical attack is not required to demonstrate a substantial risk of serious harm, mere fear of an assault is insufficient to state a claim for an Eighth Amendment violation," so "a pleading which merely asserts an unsubstantiated fear of harm fails to plead a substantial risk of serious harm." *Shand v. Chapdelaine*, 2019 WL 2302513, at *4 (D. Conn. 2019) (internal citations omitted). Petitpas only alleges a "mere fear of an assault" due to Tiede's actions; he does not allege that any inmate assaulted or attempted to assault him, or that he had any reason to believe an inmate intended to assault him. Indeed, Petitpas alleges that other inmates questioned why Tiede kept bringing up Petitpas and agreed to file complaints with Warden Faucher about Tiede's behavior. Accordingly, Petitpas has not alleged plausible grounds for relief for his Eighth Amendment claim against Tiede because he has not alleged facts to satisfy the objective element.

### *Warden Faucher*

Petitpas's amended complaint alleges two deliberate indifference claims against Warden

Faucher. First, he alleges that Faucher did nothing to address Captain Griffin and Officer Tiede's actions or the risk caused by the missing metal in the housing unit. Doc. #19 at 10 (¶¶ 41-43). Because I have determined that Petitpas has not pleaded a plausible deliberate indifference claim against Officer Tiede, Warden Faucher cannot face supervisory liability for his conduct. *See Johnson El v. Bird*, 2020 WL 5124920, at *9 (S.D.N.Y. 2020).

As to Petitpas's claim against Warden Faucher for supervisory liability for Captain Griffin's actions, Petitpas alleges Faucher "acted with extreme deliberate indifference and negligence" by not taking action in response to Petitpas's complaint about Griffin. Doc. #19 at 10 (¶ 41). "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "A defendant cannot be held personally liable for a constitutional violation by others simply based on a high position of authority in the prison system." *Wilson v. Santiago*, 2020 WL 5947322, at *5 (D. Conn. 2020) (citation omitted). To establish supervisory liability, a plaintiff must establish both "a factual connection between the defendant's alleged failure and the alleged resulting harm to the plaintiff" and "that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Ibid*. (citations omitted).

Petitpas alleges that Faucher was aware of Griffin's actions through the complaint, but does not plead any facts to establish that Faucher's actions were the proximate cause of the Eighth Amendment claim that will proceed against Griffin—his telling other inmates Petitpas was an informant—or that Faucher's conduct was more than negligent. Therefore, I will dismiss Petitpas's Eighth Amendment deliberate indifference claim against Warden Faucher to the extent it is predicated on Captain Griffin and Officer Tiede's actions.

Next, Petitpas alleges that Warden Faucher acted with deliberate indifference to his safety by failing to enforce the DOC's mask policy to protect Petitpas from COVID-19, despite Petitpas's repeated requests. Doc. #19 at 10-11 (¶¶ 44-45). It is undisputed that COVID-19 "is a highly dangerous disease that poses a significant risk of severe illness and death[.]" *Martinez-Brooks v. Easter*, 2020 WL 2405350, at *21 (D. Conn. 2020) (finding prisoners' claims during a COVID-19 outbreak satisfied the objective component for a deliberate indifference claim). Moreover, DOC's decision to require masks "was made, first and foremost, out of concern for the safety" of staff and inmates and to protect them from COVID-19. Doc. #19 at 16. For initial pleading purposes, I conclude that Petitpas has plausibly alleged that Faucher's repeated failure to enforce the mask mandate created an objectively serious risk of harm.

As to the subjective component, Petitpas alleges that Warden Faucher ignored his and other inmates' multiple direct requests, both verbally and through inmate request forms, to enforce DOC's mask policy; that Faucher stood next to an officer who was not wearing a mask less than two feet away from an inmate and did not make him put on a mask; and that Faucher's refusal to enforce the mask mandate came as a COVID-19 outbreak swept through Brooklyn. Petitpas and a majority of inmates at Brooklyn contracted COVID-19, and Brooklyn had the most COVID-19 cases of any DOC facility. These allegations that Faucher was aware of some inmates' and officers' refusal to wear masks as required by DOC policy and did not take steps to protect inmates during an outbreak are sufficient for initial pleading purposes to allege that Warden Faucher acted recklessly despite knowing the substantial risk that COVID-19 posed to Petitpas and other inmates. Accordingly, I will allow Petitpas's Eighth Amendment deliberate indifference claim to proceed against Warden Faucher.

*Deputy Commissioner Quiros*

Petitpas alleges that Deputy Commissioner Quiros acted with deliberate indifference by failing to respond to an email sent by Petitpas's friend about Captain Griffin's misconduct, and by failing to provide training or guidance for enforcing the DOC's mask policy. Doc. #19 at 12 (¶¶ 46-50). Petitpas's complaint only alleges "a negligent failure to investigate" the email his friend sent Quiros about Griffin's conduct, and "negligent conduct in a supervisory position" for Quiros's failure to provide training for DOC's mask policy—far short of the recklessness needed to plead an Eighth Amendment violation. Ibid. (¶¶ 47-48). Moreover, Petitpas has not alleged any facts suggesting a causal link between Quiros and Griffin's actions. Nor has Petitpas alleged any facts suggesting that Quiros had any participation in, or even knowledge of, the lack of enforcement of the mask policy at Brooklyn. Accordingly, Petitpas has not alleged a plausible Eighth Amendment claim against Deputy Commissioner Quiros.

*Injunctive relief*

Petitpas seeks injunctive relief related to his conditions of confinement at Brooklyn. Doc. #19 at 13-14. Because Petitpas has since been transferred to Corrigan, Doc. #24, I will dismiss his claims for injunctive relief. *See Washington v. McKoy*, 2020 WL 3042122, at *1 (2d Cir. 2020) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)).

*Official capacity claims*

Petitpas's sole remaining claims are for money damages against Captain Griffin and Warden Faucher, who Petitpas sues in their individual and official capacities. Doc. #19 at 13. DOC employees are immune from money damages suits in their official capacities. *See Currytto*

14

*v. Doe*, 2019 WL 2062432, at *4 (D. Conn. 2019) (citing *Pennhurst State Sch. & Hosp. v. Haldermann*, 465 U.S. 89, 100 (1984) and *Davis v. New York*, 316 F.3d 93 (2d Cir. 2002)). Accordingly, I will dismiss Petitpas's official-capacity claims for money damages, and the remaining claims against Captain Griffin and Warden Faucher shall proceed against them in their personal capacities only.

## CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1) Petitpas's Eighth Amendment deliberate indifference claims may proceed only against Captain Griffin for telling other inmates Petitpas was an informant and only against Warden Faucher for failure to enforce the DOC's mask policy. These claims may proceed against Griffin and Faucher only in their individual capacities for money damages. The Court DISMISSES without prejudice all of Petitpas's other claims against all other defendants.

(2) If Petitpas believes there are additional facts he can allege that will overcome any of the deficiencies identified in this ruling, then he may file a proposed amended complaint by **December 14, 2020**.

(3) Petitpas's motion to preserve the "job recall history" of a DOC printer (Doc. #23) is DENIED as moot in light of the dismissal of Officer Tiede from this case.

(4) The Clerk shall verify the current work addresses for Captain Griffin and Warden Faucher with the DOC Office of Legal Affairs, mail waiver of service of process request packets containing the complaint to those defendants at the confirmed addresses within **twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than the **thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that

defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(5) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(6) Captain Griffin and Warden Faucher shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(7) The discovery deadline is **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this Order. The order can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(8) All motions for summary judgment shall be filed within **seven months (210 days) from the date of this Order.**

(9) Pursuant to Local Rule 7(a), a nonmoving party must respond to a dispositive motion (i.e., a motion to dismiss or a motion for summary judgment) within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(10) If Petitpas changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)(2) provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Petitpas must give notice of a new address even if he is incarcerated. He

should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Petitpas has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Petitpas should also notify the defendants or defense counsel of his new address.

(11) Petitpas shall utilize the Prisoner E-Filing Program when filing documents with the Court. Petitpas is advised that the Program may be used only to file with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven this 21st day of November 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge