UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHAD J. PETITPAS,<br>    *Plaintiff*,<br><br>         v.<br><br>GRIFFIN *et al.*,<br>    *Defendants*. | No. 3:20-cv-00769 (JAM) |

**SECOND INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Chad J. Petitpas is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* under 42 U.S.C. § 1983 against four DOC employees, principally alleging that they violated his constitutional rights by retaliating against him, putting his safety at risk, and failing to take adequate steps to combat COVID-19. He seeks damages and injunctive relief in connection with his claims.

In a prior initial review order, I allowed Petitpas's Eighth Amendment claims to proceed against two defendants, and I dismissed all Petitpas's remaining claims without prejudice. Petitpas timely filed a second amended complaint that includes additional factual allegations in support of his claims. For the reasons set forth below, I will allow several more of Petitpas's claims to proceed after my second initial review.

### BACKGROUND

Petitpas names four defendants: Captain Griffin, Officer Tiede, Warden Stephen Faucher, and then-Deputy Commissioner Angel Quiros. Doc. #30 at 16-17. Each defendant is sued in their official and "unofficial" capacities, which I construe to mean their individual capacities. *Ibid*.

The following facts are alleged in Petitpas's second amended complaint and the documents attached to it, and they are accepted as true for purposes of initial review only.

1

On April 21, 2020, the DOC Commissioner issued a mask requirement for on-duty DOC staff members whenever social distancing is not possible, effective on April 22. *Id*. at 2 (¶ 1); 19 (Ex. A). That same day, Warden Faucher of Brooklyn Correctional Institution ("Brooklyn") posted a Notice to Inmate Population, signed by Deputy Commissioner Quiros, requiring masks to be worn when inmates are exiting their cells or cubicles, or are in common areas, effective April 22, with inmates subject to progressive discipline for noncompliance. *Id.* at 2 (¶ 2); 21 (Ex. B).

On April 26, Petitpas wrote a letter to Deputy Commissioner Quiros informing him that Warden Faucher was not enforcing the mask policy at Brooklyn and was not requiring staff to wear a mask unless social distancing was not possible. *Id.* at 2 (¶ 3). Petitpas's letter explained that DOC staff were not wearing masks while they were posted to the officers' desk in the center of a dorm where inmates must go to ask for items like an Inmate Request Form, typewriter, or commissary form. *Ibid.* (¶ 3)*.* There would often be five to six officers "shoulder to shoulder" at the officers' desk not wearing masks, and very few if any of the officers would put on their masks if Petitpas or another inmate went to the desk. *Ibid.* (¶ 3). Petitpas's letter also requested clarification about what was considered to be an acceptable social distance between staff and inmates and whether staff had to wear their masks when they could not stay at least six feet apart because Faucher was relying on a "technicality" to ignore the policy. *Id.* at 14 (¶ 52). Deputy Commissioner Quiros did not respond to Petitpas's letter. *Ibid.*

On May 1, the first inmate from Petitpas's housing unit was removed after exhibiting COVID-19 symptoms; he later tested positive and was transferred to solitary confinement at Northern Correctional Institution ("Northern"). *Id.* at 3 (¶ 4). By May 8, eight more inmates were transferred to Northern. *Ibid.* (¶ 5). Between May 1 and May 8, Petitpas spoke to Warden

Faucher "on two separate occasions asking him to enforce the mask policy because staff were refusing to wear their masks and staff were ignoring the inmates who were refusing to wear their masks." *Ibid.* (¶ 6). Several other inmates also spoke to Warden Faucher about this issue. *Ibid.*

By May 10, the number of people who were sick in Petitpas's housing unit reached "frightening" levels, including Petitpas's bunk mate and others who stayed in bed and refused all meals for five days, yet these inmates refused to wear their masks. *Id.* at 4 (¶ 7).

On May 11, Petitpas asked Officer Williams to alert medical staff that other inmates in the housing unit were sick and needed temperature checks, and Officer Williams indicated he would let the "Brass" know right away, but no medical staff came to the unit. *Ibid.* (¶ 8). Petitpas also wrote two Inmate Request Forms to Warden Faucher. *Ibid.* (¶ 9). The first was a freedom-of-information request seeking confirmation of the DOC's mask policy and the number of disciplinary reports that had been issued under the mask policy. *Ibid.* The second sought to preserve two surveillance videos, which would show several inmates asking Warden Faucher on April 26 to enforce the mask policy while Officer Bauer was standing two feet away from them not wearing a mask, and Bauer and another officer on May 8 not wearing masks during their shifts. *Id.* at 4-5 (¶¶ 11, 13). Warden Faucher claimed he did not receive these requests. *Ibid.* (¶¶ 10, 12). Petitpas and two other inmates again requested to have medical staff perform temperature checks on May 12, but no medical staff came to the unit. *Id.* at 5 (¶ 14).

On May 13, Petitpas contacted a friend by telephone and requested that the friend contact the facility and Deputy Commissioner Quiros about the lack of response to the requests for temperature checks and the failure of correctional and medical staff to provide medical attention for inmates who exhibited COVID-19 symptoms. *Ibid.* (¶ 15). Petitpas's friend sent an email to Quiros and other DOC officials that same day about the lack of medical assistance for inmates

3

and stating that "the mask mandate is also not working at this facility as the staff may or may not be compliant at their discretion." *Id.* at 14 (¶ 53); 47 (Ex. H). At that time, at least three of the four dorms were on quarantine status, and dozens of sick inmates had been sent to Northern's unit for COVID-19 positive inmates. *Id.* at 14 (¶ 53).

About 30 minutes after Petitpas called his friend, medical staff came to the housing unit to take the inmates' temperatures. *Id.* at 5 (¶ 16). The phone monitor told Petitpas that Deputy Commissioner Quiros called the facility after getting the email from Petitpas's friend. *Id.* at 14 (¶ 54).

That same day at 2:00 pm, while Petitpas was at recreation, Captain Griffin came to his unit and told the inmates that "Petitpas, is on the phone dropping kites (notes) YOU ARE SICK!" *Id.* at 6 (¶ 17). Several inmates confronted Petitpas believing he was an informant because of Griffin's statements. *Ibid.* (¶ 18). This action allegedly placed Petitpas at risk of serious injury because of how it changed his reputation among the inmates. *Id*. at 10-11 (¶¶ 39-41).

Petitpas's complaint attaches four declarations from other inmates that corroborate his version of Griffin's actions. *See id*. at 50-53. Justin Sanchez's declaration states that "Captain Griffin could be heard repeating Petitpas' name at every cube she went into clearly trying to make it seem Petitpas was snitching on people who are sick," and that "this caused tension in the dorm." *Id*. at 51 (¶¶ 3-4). Steven Marshall's declaration states that "many people in the dorm were mad about what [Griffin] said and a few people confronted Petitpas wanting to know why [Griffin] would make something like that up." *Id*. at 53 (¶ 3).

Petitpas never told Griffin about any inmate in his unit, so she must have obtained the information from his phone call to a friend, even though she is not the phone monitor and DOC

4

staff are prohibited from sharing confidential information under Administrative Directive 1.13. *Id.* at 6-7 (¶ 22).

On May 14, Petitpas's friend sent a second email to Deputy Commissioner Quiros that described how "Captain Griffin went around waking every man who was sleeping yesterday to say 'Chad says [you're] sick. Are you sick?'" *Id.* at 14 (¶ 54); 48 (Ex. I). Quiros never responded to this second email. *Id.* at 14 (¶¶ 54-55).

On May 14, Petitpas also filed a written complaint to Warden Faucher requesting that Griffin be reprimanded for her statements in violation of DOC Administrative Directives 1.13 and 2.17, and requesting that Griffin provide a written apology and a clarification that she had made up the accusation that he was an informant. *Id.* at 6 (¶ 20); 22-26 (Ex. C). In response to this complaint, Warden Faucher acknowledged that Petitpas's "name was mentioned during the course of a conversation as to why [Griffin] was questioning [the inmates'] state of health," but that he saw no violation of the Administrative Directives "as there was not malicious intent or confidential information divulged." *Id.* at 6 (¶ 21); 27 (Ex. C).

On May 18, Officer Salisbury confronted two individuals in Petitpas's dorm who were not wearing their masks appropriately and ordered the inmates onto their bunks, denying everyone access to the day room, phones, and showers. *Id.* at 15 (¶ 57). Petitpas was ordered to remain on his bunk the entire shift less than three feet from his bunk mate who "was visibly sick with a dry cough that could be heard across the dorm." *Ibid.* Petitpas alleges that these dangerous conditions were the result of the lack of proper training or guidance on Quiros's mask policy and how to use of "progressive discipline" to hold individual offenders accountable. *Ibid.* (¶¶ 58-59).

That same day, Officer Miller discovered that a four-inch piece of metal had been broken off of two different lockers in the unit, posing a potential safety risk to inmates and staff. *Id.* at 7

(¶ 23). Warden Faucher and Captain Griffin were notified about the missing metal pieces, but they took no measures to abate that risk, and the two metal pieces remain outstanding. *Ibid.*

On May 23, Petitpas was reading on his bed when he heard Officer Tiede screaming at an inmate Jose Marquez, who is a well-known and openly affiliated Latin King, about not wearing his mask correctly. *Id.* at 7 (¶¶ 24-25). After Marquez asked Tiede not to scream at him, Tiede responded by screaming at Marquez to put his mask on and that if Marquez had "a problem with it" to "go take it out on Petitpas! Petitpas is who you should be mad at." *Ibid.* (¶ 24).

Marquez sat at a table with three other Latin King-affiliated inmates as Tiede continued to scream Petitpas's name repeatedly. *Ibid.* (¶ 25). Some inmates yelled back to Tiede, asking what Petitpas had "to do with anything" and why did Officer Tiede keep bringing him up, while others called for Petitpas to confront Officer Tiede. *Ibid.* Petitpas attempted to approach Tiede to ask him to stop using his name to incite the inmates, but Tiede was "belligerent" and continued to scream Petitpas's name for several minutes even after Petitpas walked away from him. *Id.* at 8 (¶ 26).

Petitpas's complaint attaches three declarations from other inmates that corroborate his version Tiede's actions. *See id*. at 53-57. Michael Chapman's declaration states that Tiede "pointed to Petitpas' cube and told the offending inmate to go take it up with Petitpas" and that Tiede's actions "created an immediate uproar from the inmates in the dorm" and "had the potential for violence towards … Petitpas." *Id*. at 55 (¶¶ 4-5).

The following evening, Marquez was given an informal disciplinary report by Officer Salisbury, who is Officer Tiede's closest associate. *Ibid.* (¶ 27). After he refused to sign the report, Marquez received a Class A or B disciplinary report. *Ibid.* Marquez "immediately began to blame" Petitpas for the disciplinary report. *Ibid*. After Marquez was found guilty of the

6

infraction, he lost RREC credit. *Ibid.* (¶ 28). Marquez held Petitpas responsible and wanted to fight him. *Ibid.* Marquez and two of his "associates"—Manor and Bryan—remarked that "something was not right" about two different officers calling Petitpas a "snitch" in one week. *Ibid.* They wanted him to move to another dorm, but Petitpas said that he had done nothing wrong and would rather fight. *Ibid.* Several other inmates got involved to de-escalate the confrontation. *Ibid.* The fight was avoided because Petitpas tested positive for COVID-19 and was moved to another dorm that was serving as the quarantine unit. *Id.* at 8-10 (¶¶ 28, 36).

Several officers encouraged Petitpas to write up this incident and indicated Tiede's actions made them uncomfortable working with Tiede, especially given the missing pieces of metal in the unit. *Id.* at 9 (¶ 31). Petitpas filed a written complaint with Faucher on May 24, which requested that Tiede be reprimanded for violating Administrative Directives 1.13 and 2.17, and placed on a status in which he could not have contact with inmates. *Id.* at 9 (¶ 34); 28-31 (Ex. D). Faucher's response on June 11 stated Petitpas's allegations of staff misconduct "will be looked into." *Id.* at 9 (¶ 35); 32 (Ex. E).

On June 17, after Petitpas had tested positive for COVID-19 and had been moved to the quarantine unit across the hall, Tiede came to the quarantine unit even though he was not working in it. *Id.* at 9-10 (¶ 36). Tiede called Petitpas "everyone's problem," blamed inmates having to move out of their units on him, and told those frustrated by the cleaning and mask requirements to "get together and take it out on Petitpas." *Id.* at 10 (¶ 36). Marquez's associate Manor heard Officer Tiede say "[a]ll they need to do is look Petitpas up to see what he is all about" and relayed this to Marquez. *Id.* at 8 (¶ 29). When Petitpas returned from the quarantine unit, Marquez made a comment about looking Petitpas up. *Ibid.* Another inmate named Deputy became involved and threatened to look up Marquez about why he cannot be around his own

7

kids, at which point Marquez punched Deputy in the face and attacked Deputy with a chair in the middle of the dorm. *Ibid.*

Petitpas filed a written complaint about Officer Tiede's conduct on June 17, as did two other inmates whose complaints corroborated Petitpas's allegations. *Id.* at 10 (¶ 38); 33-34, 37-39 (Ex. F). In response to Petitpas's complaint, Warden Faucher stated "[a] review of the allegations of misconduct has been conducted, and the issue has been handled as deemed appropriate." *Id.* at 35 (Ex. F).

Ultimately, 51 of the 80 inmates in Petitpas's initial housing unit tested positive for COVID-19. *Id.* at 11 (¶ 41). Brooklyn had more COVID-19 cases than any other DOC facility, with 220 of 330 inmates contracting COVID-19, as well as more than half of the 68 correction officers. *Id.* at 12-13 (¶ 56).

In my initial review order addressing Petitpas's first amended complaint, I allowed Petitpas's Eighth Amendment deliberate indifference claims to proceed only against Captain Griffin and Warden Faucher in their individual capacities for money damages. *See* Doc. #25; *Petitpas v. Griffin*, 2020 WL 6826723 (D. Conn. 2020). I dismissed all of Petitpas's other claims without prejudice to the filing of a proposed amended complaint. *Ibid*.

On December 30, 2020, Petitpas timely filed a second amended complaint, which alleges additional facts and otherwise reasserts claims against each defendant for retaliation in violation of his First Amendment rights and deliberate indifference to his health and safety in violation of the Eighth Amendment. Doc. #30 at 11-15 (¶¶ 41, 45, 51, 59). Petitpas once again seeks money damages and injunctive relief related to his conditions of confinement at Brooklyn. *Id.* at 16-17. Petitpas is currently incarcerated at Corrigan Correctional Institution. Doc. #35.

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g., Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

As I have already allowed some of Petitpas's claims to proceed, this initial review order will only evaluate the claims that Petitpas reasserts with additional factual allegations that I previously dismissed. I will again dismiss Petitpas's claims for injunctive relief and for damages against the defendants in their official capacities because Petitpas has not alleged any facts that could cure the defects with those types of claims that I identified in my first initial review order. *See Petitpas*, 2020 WL 6826723, at *7.

***First Amendment retaliation***

Petitpas alleges that each defendant violated his First Amendment rights by retaliating

against him for his complaints about Brooklyn's response to COVID-19 and their subsequent actions. Doc. #30 at 11-15 (¶¶ 41, 45, 51, 59).

"Prison officials may not retaliate against inmates for exercising their constitutional rights." *Perez v. Cook*, 2020 WL 3893024, at *5 (D. Conn. 2020) (citation omitted). "To establish a First Amendment retaliation claim, [Petitpas] must show (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (cleaned up). The adverse action must have been serious enough to "deter a similarly situated individual of ordinary firmness from exercising [his] constitutional rights." *Fabricio v. Annucci*, 790 F. App'x 308, 311 (2d Cir. 2019) (same).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015). For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.* (cleaned up).

Petitpas alleges that Captain Griffin retaliated against him in violation of the First Amendment by telling the inmates in Petitpas's housing unit that he was an informant after he called and asked his friend to alert Quiros to Brooklyn's inadequate COVID-19 response. Doc. #30 at 10-11 (¶¶ 39-41).

A prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety. *See Gomez v. Dep't of Corr.*, 2020 WL 6526108, at *3 (D. Conn. 2020) (finding plaintiff's verbal complaint about staff failure to use personal protective equipment sufficient to establish protected speech or conduct for purposes of initial review). "The filing of grievances clearly constitutes protected activity; courts within this Circuit have also found that in some circumstances this protection extends beyond the filing of formal grievances to oral complaints made to corrections officers." *Dehaney v. Chagnon*, 2017 WL 2661624, at *3 (D. Conn. 2017) (cleaned up). I conclude Petitpas's phone call and his friend's relaying Petitpas's complaint to the DOC and Quiros is protected activity for initial pleading purposes.

The Second Circuit has explained that labeling an inmate an informant does not constitute an "adverse action" giving rise to a First Amendment retaliation claim without "some factual showing that that the comments by the prison officials actually risked inciting other inmates" against him. *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). Petitpas has now alleged specific facts, including through declarations from other inmates, that plausibly suggest that Captain Griffin's accusations actually risked inciting other inmates against Petitpas and that they subjected Petitpas to a risk of harm sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights. Petitpas also plausibly alleges a causal connection between Captain Griffin's actions and Petitpas's protected speech because of the short time period between Petitpas's friend's email and Captain Griffin's actions. Accordingly, I conclude for initial pleading purposes that Petitpas has alleged enough facts to allow his First Amendment retaliation claim against Officer Tiede to proceed.

Next, Petitpas alleges that Officer Tiede retaliated against him for filing complaints with Warden Faucher, first about the lack of measures taken at Brooklyn in response to COVID-19 and then about Tiede's prior conduct toward Petitpas. Doc. #30 at 11-12 (¶¶ 42, 45). "The filing of prison grievances is a protected activity." *Brandon*, 938 F.3d at 40. As to the second prong, Petitpas's second amended complaint includes factual allegations detailing how Officer Tiede repeatedly told inmates to take out their frustrations on Petitpas, and how those accusations actually risked inciting other inmates against Petitpas. In particular, Petitpas alleges Tiede's accusations caused a Latin King-affiliated inmate to blame Petitpas for his disciplinary report for failure to comply with the DOC's mask mandate and to want to fight Petitpas. According to another inmate who observed Tiede's actions, they "created an immediate uproar from the inmates in the dorm" and "had the potential for violence towards … Petitpas." Doc. #30 at 55 (¶¶ 4-5). Tiede's actions would plausibly deter an inmate of ordinary firmness from exercising his constitutional rights. Petitpas also alleges a plausible causal connection between his filing complaints with Faucher and Tiede's accusations. Accordingly, I will allow Petitpas's First Amendment retaliation claim against Captain Griffin to proceed.

As to Warden Faucher and Deputy Commissioner Quiros, however, Petitpas does not allege any non-conclusory facts that suggest either Faucher or Quiros personally retaliated against him. Even though Petitpas has alleged plausible retaliation claims against Griffin and Tiede, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, in order to "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without

relying on a special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020).

Here, Petitpas alleges that Faucher created "an atmosphere ripe for retaliation" by identifying Petitpas as the inmate who complained about enforcing the DOC's mask policy, that he ignored other complaints that Petitpas filed, and that he failed to abate the risks created in the dorm after Tiede's accusations and the pieces of metal went missing. Doc. #30 at 12 (¶¶ 48-49). He also alleges that Quiros failed to investigate his friend's email about Captain Griffin's misconduct, that he would not have been subject to retaliation if Quiros had addressed that complaint, and that Quiros had "no qualms" about maintaining a code of silence about gross staff misconduct. *Id*. at 14-15 (¶ 55). None of these allegations plausibly establish how Faucher or Quiros personally participated in any of the "adverse actions" against Petitpas in response to his filing complaints. Accordingly, I will dismiss Petitpas's First Amendment retaliation claims against Faucher and Quiros.

### *Eighth Amendment deliberate indifference*

Petitpas alleges that each defendant was deliberately indifferent to his health and safety in violation of the Eighth Amendment. *Id*. at 11-15 (¶¶ 41, 45, 51, 59). The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. The Supreme Court has long recognized that prison officials violate the Eighth Amendment if they are deliberately indifferent to a substantial risk of serious harm to a sentenced prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "The Eighth Amendment requires prison officials to 'take reasonable measures to guarantee the safety of the inmates,'" and "[t]hat extends to 'protect[ing] prisoners

from violence at the hands of other prisoners.'" *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Farmer*, 511 U.S. at 832, 833).

In order to establish an Eighth Amendment claim of deliberate indifference to safety, a prisoner must show that: (1) he was subject to conditions of confinement that posed an objectively serious risk of harm, as distinct from what a reasonable person would understand to be a minor risk of harm; and (2) a defendant prison official acted not merely carelessly or negligently but with a subjectively reckless state of mind akin to criminal recklessness (*i.e.*, reflecting actual awareness of a substantial risk that serious harm to the prisoner would result). *See Morgan*, 956 F.3d at 89; *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

I have already allowed Petitpas's Eighth Amendment deliberate indifference claims to proceed against Captain Griffin for telling other inmates Petitpas was an informant and against Warden Faucher for failure to enforce the DOC's mask policy. *Petitpas*, 2020 WL 6826723, at *7. Because Petitpas's remaining Eighth Amendment claims differ with respect to each defendant, I will address them each in turn.

### *Officer Tiede*

Petitpas brings an Eighth Amendment deliberate indifference claim against Officer Tiede for—on two separate occasions—screaming Petitpas's name, suggesting Petitpas is a snitch, and encouraging other inmates to take out their frustrations on him, even after prison officials knew that two pieces of metal had gone missing. Doc. #30 at 11-12 (¶¶ 42-45).

The Second Circuit has recognized that "a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners." *Burns v.*

*Martuscello*, 890 F.3d 77, 91 (2d Cir. 2018). Petitpas alleges that Tiede suggested to known members of the Latin Kings gang that Petitpas was a snitch, repeatedly encouraged them to take out their frustrations with the DOC's mask mandate on Petitpas, and told them to look Petitpas up "to see what he is all about." Additionally, Petitpas alleges that Tiede's actions actually caused other inmates to threaten Petitpas with violence, distinguishing Petitpas's second amended complaint from his prior complaint which only alleged he had a "mere fear of an assault" due to Tiede's actions. *See Petitpas*, 2020 WL 6826723, at *6. For the objective prong, Petitpas has plausibly alleged that he faced an objectively serious risk of harm as a result of Tiede's actions.

As to the subjective prong, Petitpas has plausibly alleged that Tiede acted recklessly by repeatedly encouraging other inmates to take out their frustrations on Petitpas and by causing other inmates to believe Petitpas was a snitch, even though it is "well understood that inmates known to be snitches are widely reviled within the correctional system." *Burns*, 890 F.3d at 91. Accordingly, I conclude that Petitpas has sufficiently alleged that Tiede acted with deliberate indifference to a substantial risk of serious harm to his safety for initial pleading purposes.

### *Warden Faucher*

Petitpas alleges Warden Faucher "acted with extreme deliberate indifference" by not taking action or reducing the risk to Petitpas's safety that was created by Griffin and Tiede's conduct, especially after the two pieces of metal went missing. Doc. #30 at 12 (¶¶ 46-47, 49). "For deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti*, 983 F.3d at 616.

Petitpas alleges that he and other inmates submitted five written complaints to Warden

Faucher describing how Captain Griffin had identified Petitpas as an informant to the inmates in his dorm, how Officer Tiede had twice encouraged the inmates to take out their frustrations with the DOC's COVID-19 policies against Petitpas, and how Griffin and Tiede's actions put Petitpas at risk of violence. Warden Faucher acknowledged receipt of each of the complaints and in each case stated that the allegations had been or would be investigated. *See* Doc. #30 at 27, 32, 35, 37, 39. However, Petitpas alleges Warden Faucher took no measures to ensure Petitpas's safety within Brooklyn. For initial pleading purposes, I conclude that Petitpas has satisfied the subjective prong because he has plausibly alleged that Warden Faucher "personally knew of and disregarded an excessive risk to [Petitpas's] health or safety." *Tangreti*, 983 F.3d at 619.

Additionally, Petitpas has plausibly alleged Warden Faucher's inaction contributed to conditions of confinement that objectively posed an unreasonable risk of serious harm for the same reasons stated above. Accordingly, I will allow Petitpas's Eighth Amendment deliberate indifference claim to proceed against Warden Faucher for his inaction in response to Petitpas's complaints and Griffin and Tiede's conduct.

### *Deputy Commissioner Quiros*

Petitpas alleges that Deputy Commissioner Quiros acted with deliberate indifference by failing to respond to an email sent by Petitpas's friend about Captain Griffin's misconduct, and by failing to provide training or guidance for enforcing the DOC's mask policy and failing to take further action as Brooklyn was "consumed by positive COVID-19 cases." Doc. #30 at 14-15 (¶¶ 52-59).

With respect to Petitpas's claim against Quiros related to Griffin's conduct, Petitpas's only allegation that Quiros had any knowledge of the incident is that he received an email from Petitpas's friend complaining that "Captain Griffin went around waking every man who was

sleeping yesterday to say 'Chad says [you're] sick. Are you sick?'" Doc. #30 at 48 (Ex. I). That statement, and Quiros's alleged failure to respond to or investigate it, does not on its own plausibly allege that Quiros had subjective knowledge that Petitpas faced a substantial risk of serious harm and disregarded it. Accordingly, I will dismiss Petitpas's Eighth Amendment claim against Quiros to the extent it relates to Griffin's conduct.

As to Petitpas's claim related to the DOC's mask mandate and COVID-19 policies, it is undisputed that COVID-19 "is a highly dangerous disease that poses a significant risk of severe illness and death[.]" *Martinez-Brooks v. Easter*, 2020 WL 2405350, at *21 (D. Conn. 2020) (finding prisoners' claims during a COVID-19 outbreak satisfied the objective component for a deliberate indifference claim). Moreover, the DOC's decision to require masks "was made, first and foremost, out of concern for the safety" of staff and inmates and to protect them from COVID-19. Doc. #30 at 19. The Notice to Inmate Population signed by Quiros states "[t]he wearing of masks is being required for your personal safety." *Id*. at 21. Petitpas describes several instances in which he was exposed to increased risks after the mask mandate went into effect because of staff or inmates' failure to comply with the mask policy, and Petitpas ultimately tested positive for COVID-19 after these incidents. For initial pleading purposes, I conclude that Petitpas has plausibly alleged that Quiros's failure to provide training or guidance related to the mask mandate, and his failure to take further action following Petitpas's complaints, created an objectively serious risk of harm.

For the subjective prong, Petitpas alleges that he wrote to Quiros on April 26, a few days after the mask mandate went into effect, stating that it was not being enforced at Brooklyn and that Warden Faucher was relying on a "technicality" to ignore it. *Id*. at 14 (¶ 52). On May 13, Petitpas's friend emailed Quiros that "the mask mandate is also not working at this facility as the

17

staff may or may not be compliant at their discretion." *Id*. at 47 (Ex. H). Although Quiros responded to that email by ordering temperature checks in Petitpas's dorm, Petitpas alleges that Quiros did not take any other steps to address the lack of compliance with the mask mandate that Quiros had put in place. Petitpas also alleges that Quiros would have been aware that Brooklyn was "consumed" with COVID-19 cases over this period because more than half of inmates and staff at Brooklyn eventually tested positive for COVID-19 and Brooklyn had more COVID-19 cases than any other DOC facility. Despite knowing the risk COVID-19 posed to inmates at Brooklyn including Petitpas personally, Petitpas alleges that Quiros did not make any changes to improve compliance with the mask mandate at Brooklyn, did not take any steps to address training or guidance for the policy, and did not discipline non-compliant inmates or staff. For initial pleading purposes, I conclude that that Petitpas has plausibly alleged that Quiros had subjective knowledge of a substantial risk of serious harm to Petitpas and disregarded it.

Accordingly, I will allow Petitpas's Eighth Amendment deliberate indifference claim to proceed against Deputy Commissioner Quiros.

## CONCLUSION

In accordance with the foregoing analysis and the Court's prior initial review order, the Court enters the following orders:

(1) Petitpas's First Amendment retaliation claims may proceed against Captain Griffin and Officer Tiede. Petitpas's Eighth Amendment deliberate indifference claims may proceed against Captain Griffin for telling other inmates Petitpas was an informant; against Officer Tiede for suggesting Petitpas was an informant and encouraging other inmates to take out their frustrations on Petitpas; against Warden Faucher for failure to enforce the DOC's mask policy and for inaction in response to Petitpas's complaints and Griffin and Tiede's conduct; and

against Deputy Commissioner Quiros for failing to enforce the mask mandate and take steps to address the COVID-19 outbreak at Brooklyn. These claims may proceed against the defendants only in their individual capacities for money damages. The Court DISMISSES all of Petitpas's other claims against all defendants.

(2) The Clerk shall reinstate Officer Tiede and Commissioner Quiros as defendants in this case and shall verify their current work addresses with the DOC Office of Legal Affairs, mail waiver of service of process request packets containing the complaint to those defendants at the confirmed addresses within **twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than the **thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(3) The Clerk shall send a courtesy copy of the second amended complaint and this Order to the DOC Office of Legal Affairs.

(4) The defendants shall file their response to the second amended complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(5) The discovery deadline is extended to **November 2, 2021**.

(6) The deadline for motions for summary judgment is extended to **December 2, 2021.**

(7) Pursuant to Local Rule 7(a), a nonmoving party must respond to a dispositive motion (i.e., a motion to dismiss or a motion for summary judgment) within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the Court may

grant the dispositive motion without further proceedings.

(8) All other previously entered orders remain in effect except as modified by this order.

It is so ordered.

Dated at New Haven this 6th day of May 2021.

                                                /s/ *Jeffrey Alker Meyer*
                                                Jeffrey Alker Meyer
                                                United States District Judge